UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CRIMINAL NO. 07-316 (PLF) |
| : | |
| ROY V. GRAY, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following sentencing recommendation and reasons in support of such recommendation:

1. On November 30, 2007, the defendant pleaded guilty to one count of Making, Uttering or Possessing a Forged Security, in violation of 18 U.S. Code §513(a). The Presentence Investigation Report has determined the applicable Guidelines range to be 24 to 30 months imprisonment. The government requests that the Court sentence the defendant to 24 months imprisonment.

Facts

2. In early September 2006, Hans Land, on behalf of DF-Vimarc Corporation, a North American distributor of vibrator motors made in the Netherlands by Vimarc B.V., hired defendant as a part-time accountant with a salary of $45 per hour. Mr. Land hired defendant based on the qualifications set out in his resume, which listed degrees in Business Administration from the University of the West Indies and in accounting from a local university, and based on his conversations with numerous references, including a Senior Director at the Brookings Institute. Mr. Land did not consider defendant to be a mere bookkeeper, but rather a professional accountant as

reflected by his resume, references, and demeanor.

3.      Defendant worked one or two days per week, side-by-side with Mr. Land in his home office in Washington, D.C. Mr. Gray's duties included keeping records of DF-Vimarc's corporate expenditures and providing a weekly cash status report to Mr. Land. As a result of his duties, Mr. Gray had access to DF-Vimarc's corporate checkbook and to Quikbook, the corporation's financial computer software. Mr. Gray did not have signature authority for corporate checks at any time during his employment.

4.      Beginning on September 14, 2006, almost immediately after he was hired and continuing for over eight months, Mr. Gray without authorization wrote 44 corporate checks to himself or to his organization, B.G.&G., also known as Bentley, Gray & Gray, totaling $245,302.55. Mr. Gray forged Mr. Land's signature on each of these checks and subsequently uttered them at various banks in the District of Columbia and elsewhere. Forty-two of these checks were honored, resulting in a total loss to DF-Vimarc Corporation of $231,122.55. Ultimately, defendant's scheme was disrupted when Wachovia Bank, at which DF-Vimarc Corporation held its account, noticed suspicious activity in the company's account and notified Mr. Land of that activity.

5.      Defendant concealed his unauthorized activity by posting the checks drawn to himself or his organization in the corporation's manual checkbook to various legitimate creditors in small amounts approximating that of a typical bill. Defendant then posted the checks in Quikbook in the correct amount, but often to different creditors with whom the corporation conducted large-dollar transactions. Defendant also concealed his activity by removing entire pages from the corporate checkbook, or by removing checks from the back of the checkbook, so that their absence would not be noticed. In these instances, he failed to post the checks manually and often did not post them in

Quikbook.

6.     Mr. Land describes his relationship with defendant as very personal, not just that of employer and employee. Indeed, Mr. Land indicates that he treated defendant like a member of the family. Defendant acknowledged as much in a video-taped statement he gave to the police on July 9, 2007, in which he said, "Hans treated me very good. He treated me like family. He was very kind, very generous." Defendant also admitted in that statement that forging the checks "was easy because he trusted me.... He trusted me with his business; he trusted me with his personal affairs; he trusted me with his livelihood; he trusted me with his welfare."[1]

7.     Defendant described himself in July 2007 as "completely broke." He explained that he gambled away all of the money that he stole from DF-Vimarc. His account is largely borne out by an analysis of his bank records, which reflect that defendant made ATM, teller and other cash withdrawals in the following amounts over the period that he was stealing from DF-Vimarc:

| | |
|---|---|
| September 2006 | $ 8,284 |
| October 2006 | $ 32,096 |
| November 2006 | $ 14,789 |
| December 2007 | $ 26,532 |
| January 2007 | $ 35,392 |
| February 2007 | $ 21,443 |
| March 2007 | $ 23,900 |
| April 2007 | $ 9,814 |
| May 2007 | $ 27,186 |
| TOTAL | $199,436 |

Almost sixty cash withdrawals were made in Atlantic City, New Jersey during this eight month time period. In addition to cash withdrawals, defendant also wrote personal checks to numerous individuals totaling $25,578, including checks totaling $12,500 to a single individual.

---

[1]     The government will deliver a copy of defendant's video-taped statement, previously provided to the defense, to chambers for the Court's consideration at sentencing.

8. Defendant did not gamble away all of the money he stole from DF-Vimarc, however. A significant sum went toward luxuries, including $6,416 for massage, spa and salon services, $3,886 for airfare, and $332 for two visits to the Fairmont Hotel in Washington, D.C.

<u>Acceptance of Responsibility</u>

9. The government agrees that the defendant should receive an additional one point adjustment for acceptance of responsibility pursuant to §3E1.1(b) of the Sentencing Guidelines. *See* Plea Agreement at p. 3.

<u>Enhancement for Abuse of Trust</u>

10. The Presentence Investigation Report (hereinafter "PSR") correctly applies a two-level adjustment to defendant's offense level for his role in the offense under §3B1.3 of the United States Sentencing Commission, <u>Guidelines Manual</u> (2007) (hereinafter "Sentencing Guidelines" or "U.S.S.G.") because he "held a position of trust offering him professional discretion when accessing corporate funds." *See* PSR at ¶23. Defendant contests application of this adjustment.

11. U.S.S.G. §3B1.3 provides for a two-level adjustment to defendant's base offense level "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." The commentary defines a position of "public or private trust" to include a position "characterized by professional or managerial discretion (<u>i.e.</u>, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Id.*, comment. (n.1) Specific examples include "an embezzlement of a client's funds by an attorney serving as a guardian" or "a bank executive's fraudulent loan scheme," but not "embezzlement or theft by an

ordinary bank teller or hotel clerk." *Id.* "Special skill" is defined in the commentary as a "skill not possessed by members of the general public and usually requiring substantial training, education or licensing." *Id.*, comment. (n.4)  Accountants specifically are mentioned among the examples of positions requiring such skills. *Id.*

12. The case law interpreting §3B1.3 clearly supports application of the enhancement in this case.  In *United States v. Shyllon*, 10 F.3d 1 (D.C. Cir. 1993), *cert. denied*, 510 U.S. 1206 (1994), the D.C. Circuit "embrace[d]" the following test for determining whether a particular position constitutes a position of trust:

> The extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's duties as compared to those of other employees; defendant's level of specialized knowledge; defendant's level of authority in the position; and the level of public trust.

*Id.* at 5, *quoting United States v. Queen*, 4 F.3d 925, 928-9 (10th Cir. 1993), *cert. denied*, 510 U.S. 1182 (1994) (citation omitted).  The Circuit subsequently affirmed application of the enhancement to an office manager who was able to submit and obtain payment for numerous false purchase orders and travel expense reports over a five-year period "largely because of the complete trust" her supervisor had in her, *United States v. Becraft*, 117 F.3d 1450, 1452 (D.C. Cir. 1997). *See also, United States v. Miller*, No. 95-3190, 1996 WL 590819, at *3-4 (D.C. Cir. Sept. 23, 1996) (unpublished opinion affirming this Court's decision to apply the enhancement to a managing partner of several real estate ventures who had custody of the partnership checkbooks and who operated essentially without supervision in depositing payments to the partnership, making necessary payments and compiling income and expense reports.)

13. Other Circuits also have upheld application of the enhancement in cases involving facts similar to those here. For example, in *United States v. Cruz*, 317 F.3d 763 (7th Cir. 2003), the Seventh Circuit upheld application of the enhancement to an office manager of a small company who, among other things, forged the company owner's signature on checks drawn on the company's accounts, then hid her unlawful activity by recording the checks in the company ledger under the name of a false payee and destroying the canceled forged checks when they were returned by the bank. *Id.* at 765. In rejecting the defendant's argument that she had "insufficient discretionary authority in her job" to warrant the enhancement, the Court noted that it "consistently" had affirmed such enhancements in similar cases. *Id.* at 767. *See also, United States v. O'Connell*, 252 F.3d 524, 528-9 (1st Cir. 2001) (upholding application of enhancement to office manager and bookkeeper who, in order to finance a gambling addiction, stole over $700,000 in three years from company, whose owners were close family friends, by making out company checks to himself and forging the owner's signature on those checks); *United States v. Covey*, 232 F.3d 641, 647 (8th Cir. 2000), *cert. denied*, 534 U.S. 814 (2001) (upholding application of enhancement to accountant who prepared loan documents to launder drug dealers' money despite defendant's claim that special skill was not required to do so, explaining that the "legal question is not whether the task could be performed by a person without special skills, but whether the defendant's special skills aided him in performing the task," and "[t]here is no requirement in the guidelines that the enhancement for use of special skills be used only for complex tasks" (citations omitted)); *United States v. Hernandez*, 231 F.3d 1087, 1089 (7th Cir. 2000) (upholding application of enhancement to staff accountant who stole over $115,000 from his employer in four months by using routine forms to route large checks directly into his hands, because the defendant not only had physical access to the company's funds, but the

company's system "was based on its faith in its staff accountants' honesty").

14.     Mr. Land hired defendant because of his accounting skills, stellar references and professional bearing. Mr. Land then gave defendant access to the resources he needed in order to do the job for which he was hired, including the corporation's checkbook and financial computer software. Mr. Land trusted defendant to do that job honestly and to the best of his ability.[2] Almost immediately, though, defendant used his accounting skills to abuse the access and trust he had been given by devising a scheme to support his gambling exploits at the company's expense and to avoid detection, which he did for over eight months. Thus, as it turned out, defendant's "probity was pecksniffian, and [his] perspicacity was picaresque." *U.S. v. Wellman*, No. 96-30259,1997 WL 418892, at *2 (9th Cir. July 24, 1997) (unpublished opinion upholding the application of enhancement to in-house accountant who embezzled funds from her employer). As a result, a two-level increase to defendant's offense level for abuse of trust is entirely justified.

### Sentencing Recommendation

15.     The Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), ruled that the Sentencing Guidelines are advisory rather than mandatory. However, the Court made clear that in determining the appropriate sentence for a defendant, federal courts still are required to calculate and consider the applicable Guidelines range, refer to the pertinent Sentencing Commission policy statements, and bear in mind the need to avoid unwarranted sentencing disparities and to provide restitution to victims. *Id.* at 259-60. Moreover, in determining an appropriate sentence for the defendant, federal courts also must continue to consider the need for the sentence imposed to

---

[2]     The government expects to call Mr. Land as a witness at the sentencing hearing to testify about these facts.

accomplish the following sentencing objectives: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. *Id.* at 260; *see also* 18 U.S.C. § 3553(a)(2).

16.     Arguably, the applicable Sentencing Guidelines range is the most important factor the Court can consider in sentencing the defendant in this case because this range is calculated based upon the Sentencing Commission's careful consideration of all of the factors the Supreme Court and Congress have directed courts to consider in sentencing defendants. Indeed, the Supreme Court recently held that Courts of Appeal "may apply a presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines," thus validating the D.C. Circuit's practice of doing so. *United States v. Rita*, ___ U.S. ___, 127 S.Ct. 2456, 2462 (2007). *See also, United States v. Dorcely*, 454 F.3d 366, 376 (D.C. Cir. 2006) ("We agree with our sister circuits that a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness.") The applicable Guidelines range in this case reflects an intensive objective analysis of sentences imposed on defendants similarly situated to defendant and is a critical tool to avoid unwarranted sentencing disparities. According to the PSR, the defendant has an adjusted offense level of 17 and a criminal history category of I, resulting in a Guidelines range of 24 to 30 months. The government's requested sentence of 24 months imprisonment is within this range.

17.     Turning specifically to the § 3553(a) factors, the defendant's offense unquestionably is serious. Within a short span of eight months, he succeeded in stealing almost a quarter of a million dollars from his employer. He then squandered that money on gambling and extravagant

expenditures. Given his age and future earning capacity following this conviction, it seems highly unlikely that defendant ever will be able to repay to any significant degree the monies he stole. The position defendant now finds himself in before this Court comes as no surprise. For years, defendant has ignored warnings of the ruinous risks associated with his gambling exploits. As the PSR reflects, not long after defendant began gambling in 1991, he began to accumulate numerous arrests for criminal conduct. PSR at ¶¶32-39. He also maintained only temporary employment during those years. *Id.* at ¶¶61-63. His gambling exploits caused financial hardship to him and his family, as reflected by his lack of any accumulated assets and his own admissions.[3] *Id.* at ¶64. His obsession also caused his family considerable emotional heartache. Although defendant realized he had a destructive gambling problem over ten years ago, he did not seriously attempt treatment for it until very recently. *Id.* at ¶56. When defendant went on this sustained stealing binge, he clearly understood, as he admitted in his video-taped statement, that what he was doing was wrong, that he was "treading on very dangerous ground" and that it was "just a matter of time" before he got caught, but he once again chose to ignore those internal warnings and immerse himself instead in momentary gratification. To his credit, defendant recognizes that he deserves to be punished. Punishment in the form of incarceration is necessary and appropriate to account for the full extent of defendant's offense and to send a message that such behavior will not be tolerated.

---

[3] In his video-taped statement, defendant talks of being confronted by his wife after he had gambled away the mortgage money and of almost missing his daughter's graduation, then having to borrow money from her that day because he had gambled away his paycheck the night before. He also stated that his wife, with the threat of destroying the marriage, "forced me to go to" Gambling Anonymous in 1989 or 1990, but "it didn't help." You "can know all the dangers, like I did, but until you want to stop, nothing can help you."

WHEREFORE, the United States respectfully requests that the Court impose a sentence of 24 months imprisonment in this case, which sentence not only is consistent with the Sentencing Guidelines and Congress's goal of ensuring uniformity in sentencing, but also is entirely appropriate and necessary to satisfy Congress's other stated sentencing objectives. .

        Respectfully submitted,

        JEFFREY A. TAYLOR
        United States Attorney

By:      /s/
        _____
        ANGELA G. SCHMIDT
        Assistant United States Attorney
        Texas Bar No. 17764980
        Federal Major Crimes Section
        555 4th Street, N.W., 4th Floor
        Washington, D.C. 20530
        (202) 514-7273
        Angela. Schmidt@usdoj.gov