IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | CRIMINAL NO. 07-316 (PLF) |
| : | |
| ROY V. GRAY : | |
| : | |
| Defendant. : | |

**MEMORANDUM IN AID OF SENTENCING**

Defendant Roy V. Gray, through counsel, respectfully submits the following Memorandum in aid of his sentencing.

On June 27, 2008, Mr. Gray will come before this Court to be sentenced pursuant to his guilty plea to making, uttering or possessing a forged security, in violation of 18 U.S.C. § 513(a). Based on all the sentencing factors in this case, Mr. Gray submits that a sentence of probation is the appropriate sentence in this matter. Due to such factors as the circumstances surrounding the offense, Mr. Gray's background, Mr. Gray's acceptance of responsibility, the United States Sentencing Guidelines, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), a sentence of probation is the most fair and reasonable sentence which can be imposed.

**DISCUSSION**

**I.    THE POST-BOOKER SENTENCING FRAMEWORK.**

Under Justice Breyer's majority opinion in Booker, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. See 18 U.S.C. § 3553(a)(4)." United States v. Booker, 125 S.Ct. 738 (2005). While holding that

1

district courts should still consider the Guideline calculations and ranges for sentencing purposes, the remedial majority in <u>Booker</u> held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Pursuant to <u>Booker</u>, therefore, courts must treat the Guidelines as one, among several, sentencing factor.

Pursuant to 18 U.S.C. §§ 3562 and 3553(a) – which were explicitly endorsed by the Supreme Court in <u>Booker</u> – sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

Pursuant to 18 U.S.C. § 3661, also expressly endorsed by the <u>Booker</u> majority:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

Section 3582 of Title 18 states that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Taken together, the directives of Booker, as well as Sections 3553, 3661, and 3582 of Title 18, make it clear that sentencing courts may no longer consider the Guidelines alone in determining the appropriate sentence. After Booker, courts need not justify sentences outside the guideline range by citing factors that take the case outside the "heartland." Rather, as long as the sentence imposed is reasonable and supported by the factors outlined in Section 3553, courts may exercise their discretion in individual cases and impose sentences which are not within the proposed guideline range.

More recently, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. See Rita v. United States, 127 S.Ct. 2456 (2007) and Gall v. United States, 128 S.Ct. 586 (2007). A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. Id.. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable. Id.. By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's

sentence to the thorough adversarial testing contemplated by federal sentencing procedure." Rita at 2465. It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court recently reemphasized, '[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.' Gall at 598 (quoting Koon v. United States, 518 U.S. 81, 113 (1996)).

## II.   A SENTENCE OF PROBATION IS REASONABLE AND APPROPRIATE.

### A.   Sentencing Guidelines

According the Presentence Report (PSR), Mr. Gray's sentencing guideline range is 24 to 30 months. Mr. Gray contends that his proper sentencing guideline range is 18 to 24 months. The only issue which is in dispute for purposes of calculating Mr. Gray's sentencing guideline range is whether a two level upward adjustment pursuant to U.S.S.G. § 3B1.3 (Abuse of Position of Trust) is applicable in this case. With the enhancement, Mr. Gray's sentencing guideline range is 24 to 30 months and his range is 18 to 24 months without the enhancement.

Under the Sentencing Guidelines, a defendant can receive a two-level upward adjustment if he "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. In the Application Notes for U.S.S.G. § 3B1.3, it is stressed that "`[p]ublic or private trust' refers to a position of public or private trust characterized by professional or managerial discretion." U.S.S.G. § 3B1.3, Application Note, 1. Cases in this Circuit have re-emphasized the importance of the standards set forth in the Application Notes to U.S.S.G. § 3B1.3 by holding that these standards must be present

in order for the abuse of trust enhancement to apply.  See U.S. v. West, 56 F.3d 216 (D.C. Cir. 1995) and U.S. v Smaw, 22 F.3d 330 (D.C. Cir. 1994).  In West, the court held that the amount of professional and managerial discretion required before an abuse of position of trust enhancement can be applied must be substantial.  West at 220.  The Court also recognized that "the commentary's focus on positions characterized by professional or managerial discretion places a significant limit on the types of positions subject to the abuse-of-trust enhancement."  Id..  Otherwise, the Smaw Court warned, the definition of a position of trust "becomes so boundless as to be meaningless."  Smaw at 332.

In addition to finding that a defendant held a position of trust characterized by substantial professional and managerial discretion, the sentencing court must also find that the defendant's position "significantly facilitated the commission or concealment of the offense" in order to apply the two level adjustment.  See U.S.S.G. § 3B1.3; see also West at 219.  It is improper to conclude that an enhancement under § 3B1.3 is justified simply because a defendant's position somehow assisted in the commission of an offense.  According to the Sentencing Guidelines, "[f]or this adjustment to apply, the position of public or private trust must have contributed in some *significant* way to facilitating the commission or concealment of the offense."  U.S.S.G. § 3B1.3, Application Note 1 [emphasis added].

Here, Mr. Gray clearly did not occupy a position of trust.  The position he occupied did not grant him "substantial professional or managerial discretion."  See West at 220.  In fact, Mr. Gray's position was neither professional nor managerial.  Although Mr. Gray's job title was as an "accountant, " Mr. Gray's actual responsibilities merely involved bookkeeping work.  Mr. Gray's duties simply "included keeping records of DF-Vimarc's corporate expenditures and providing a

weekly cash status report to Mr. Land." Factual Proffer at 1. Mr. Gray offered no professional advice and he had no supervisory authority over anyone. Moreover, Mr. Gray's employment did not require him to possess any type of license.[1]

Significantly, Mr. Gray's work was subject to supervision. Mr. Gray was not provided with the authority to write corporate checks. Mr. Gray never possessed the requisite signature authority to write such checks. Mr. Gray's employer had complete access to all financial records and books and his work was subject to monitoring at all times. An internal audit was never conducted during the period of Mr. Gray's employment at DF-Vimarc and, if such an audit would have been done, Mr. Gray's theft would have been easily detected.

In its sentencing memorandum, the government indicates that it supports the probation office's position that an enhancement for Abuse of Position of Trust applies to Mr. Gray's case. In an effort to provide support for the applicability of this enhancement, the government relies upon cases which are significantly factually dissimilar to Mr. Gray's case. For instance, the government cites District of Columbia Circuit case U.S. v. Becraft, 117 F.3d 1450 (D.C. Cir. 1997), as support for its position. When comparing Becraft with the instant case, however, some significant differences exist. In Becraft, the defendant's position was as an office manager and a marketing director. Here, Mr. Gray did not hold any managerial position and he was not a director. The court in Becraft also placed great emphasis on the supervisory nature of the defendant's position and the substantial authority the defendant exercised. In the instant case, Mr. Gray had no supervisory powers and any authority he maintained was subject to supervision, monitoring and approval.

---

[1] In fact, Mr. Gray does not possess an accounting license or any other type of professional license.

The facts of the instant case or more similar to the facts present in U.S. v. Helton, 953 F.2d 867 (4th Cir. 1992). In Helton, it was held that the district court's refusal to apply an enhancement for abuse of position of trust was proper where a low-level employee was able to steal from her employer because she was trusted by her supervisor and her conduct was not being monitored. Helton at 869-870. Despite the amount of trust the defendant received from her employer and the fact that her crimes went unnoticed for a significant period, the court held that not applying the abuse of position of trust enhancement was appropriate because her conduct could have been detected with proper monitoring. The court found it improper to apply the § 3B1.3 enhancement in cases where offenders are not properly supervised or audited and the court noted that "being subject to lax supervision alone does not convert one's job into a 'position of trust' under section 3B1.3. Id.. As in Helton, the trust Mr. Gray's employer placed in him does not make his position a position of trust. Despite the trust placed in Mr. Gray, his position was still a position without managerial or supervisory authority. Mr. Gray only worked at DF-Vimarc for one or two days per week. Mr. Gray worked out of DF-Virmarc's home office and all financial books and records remained within the office. If the financial records of the company were more carefully reviewed and if audits were performed, Mr. Gray's unlawful conduct would not have been successful. Therefore, as in Helton, Mr. Gray's position cannot be converted to a position of trust simply because his work was not properly monitored.

The evidence in the instant case also fails to support the second prong which must be proven in order for an enhancement pursuant to U.S.S.G. § 3B1.3 to apply.[2] Mr. Gray's part time

---

[2] As discussed above, the government must also prove that Mr. Gray's position "significantly facilitated the commission or concealment of the offense" in order for the Abuse of Position of Trust enhancement to apply.

7

bookkeeping duties clearly did not significantly facilitate the commission or concealment of his offense. In fact, other than being an employee at DF-Vimarc, Mr. Gray's specific position at the company did not uniquely assist in his ability to commit the offense or to conceal his crime. Since Mr. Gray did not have signature authority to write company checks in connection with his position, his position did not aid him in committing the instant offense. Mr. Gray was able to commit the instant offense by doing what any DF-Vimarc employee could have done. Any employee, as well as any other person, with a blank company check could have uttered the check and received funds from the check by forging the signature of a person who had signatory authority.

With respect to concealment, the government mentions Mr. Gray's access to the corporation's checkbook and financial computer software. The government, however, fails to show how Mr. Gray's access to these items significantly assisted him with concealing his crime. Because the corporation checkbook and financial computer software were not locked away, others had access to these materials. Therefore, Mr. Gray's position did not provide him any unique opportunity to alter or falsify company financial records.

Based on the above discussion, Mr. Gray clearly did not hold a "position of trust" while employed for DF-Vimarc. Additionally, Mr. Gray's position with DF-Virmac did not significantly facilitate the commission or concealment of the instant offense. For these reasons, an enhancement under U.S.S.G. § 3B1.3. is inapplicable in this case.

    **B.**    **18 U.S.C. § 3553(a) Factors.**

    1.    <u>Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))</u>

Sadly, Mr. Gray's involvement in the instant offense was primarily driven by his addiction to gambling. Mr. Gray has been gambling since 1991 and he began to realize that he was suffering

from an addiction to gambling in 1997. PSR, ¶ 56.[3] Mr. Gray discussed the severity of his gambling problem during a videotaped statement he made to law enforcement on the day of his arrest. In his statement, Mr. Gray explained that the money he took from his employer was used for gambling. Mr. Gray revealed to law enforcement that he has a serious addiction to gambling and he discussed the significant problems his addiction has caused in his life. Mr. Gray also indicated that it has been difficult to overcome his addiction to gambling.

The government's investigation corroborates Mr. Gray's account of how he spent the money he took from his employer. During the eight month time period in which Mr. Gray committed the instant offense, he made about sixty cash withdrawals in Atlantic City, New Jersey. Government's Sentencing Memorandum at 3. During this period, in an effort to pay his gambling debts, Mr. Gray's personal bank records show that he also wrote numerous personal checks to various individuals. Id.. Mr. Gray was very frank and candid during his interview with regard to the factors which motivated him to commit the instant offense and with respect to the tremendous amount of remorse he has for his conduct. Mr. Gray was close to his employer and he expressed serious regret for his behavior.

To his credit, Mr. Gray immediately accepted responsibility for his actions when he was questioned by law enforcement. Mr. Gray did not attempt to shift blame or minimize his conduct in any way. Mr. Gray clearly understood and accepted the fact that he would be prosecuted for his conduct. When the prosecution against Mr. Gray ensued, he continued to display an extraordinary level of acceptance of responsibility by agreeing to enter into an early pre-indictment guilty plea.

Regarding the history and characteristics of Mr. Gray, with the exception of problems he has

---

[3]Because undersigned counsel had not received the final version of the Presentence Report (PSR) by the time of the filing of this memorandum, all citations to the PSR relate to the May 20, 2008 draft PSR.

had as a result of his gambling addiction, Mr. Gray has lead a very productive, respectable, and law abiding life. Mr. Gray was born and raised in the country of Jamaica. PSR, ¶¶ 40 & 41. Due to the absence of Mr. Gray's biological parents, he was not reared by his parents. PSR, ¶ 42. Mr. Gray's mother passed away when he was only one year old and his father was absent from his life. Id.. Due to this void, Mr. Gray was raised by his grandparents. Id.. Mr. Gray managed to graduate from high school in Jamaica. PSR, ¶ 58. Immediately after graduating from high school, Mr. Gray began attending college in Jamaica. Id.. Two years later, Mr. Gray obtained a Bachelors degree in business from the University of West Indies. Id..

At about age thirty two, Mr. Gray moved to the United States. PSR, ¶ 43. He began residing in the Washington, D.C. area and he began taking courses at Benjamin Franklin University. PSR, ¶ 58. Mr. Gray eventually obtained another Bachelor's degree from Benjamin Franklin University. Id.. Between the time Mr. Gray arrived in the United States and before his gambling problem began, Mr. Gray had some significant family responsibilities. During this period, Mr. Gray was involved in three marriages and he had two children with each of his wives.[4] PSR, ¶¶ 44-47. Prior to when Mr. Gray began gambling, his life primarily involved working and taking care of his family responsibilities.[5] Mr. Gray had never been arrested and he was living a respectable life. This all changed in about 1991, at the approximate age of fifty six, when Mr. Gray began gambling. Mr. Gray's gambling caused him problems with his family and it contributed to some very poor judgment on his part. Indeed, it was not until later in his life when Mr. Gray began gambling that he suffered

---

[4] Mr. Gray has a total of six children from these marriages and he also has a total of five grandchildren.

[5] Although not mentioned in the PSR, Mr. Gray was employed at Sigma Systems, Inc. for eighteen consecutive years between about 1975 and 1992.

his first arrest.[6]

Initially, Mr. Gray believed he had his gambling under control and that his life was fine. Mr. Gray was employed and he believed he was properly taking care of his responsibilities.[7] In fact, Mr. Gray had been gambling for about six years before he realized he had a problem. PSR, ¶ 56. Even after recognizing his problem, it has been difficult for Mr. Gray to take the initial step toward eradicating his gambling addiction. Fortunately, about five months ago, Mr. Gray identified a suitable program which could help him resolve his gambling problem. PSR, ¶ 56. Mr. Gray quickly committed to participating in this program and he has been regularly attending meetings with Gambler's Anonymous in Silver Spring, Maryland since January 7, 2008. Id..

At the present moment, Mr. Gray has mixed emotions about his life. On the one hand, Mr. Gray suffers from various ailments including prostrate cancer, hypertension, arthritis, and type II diabetes. PSR, ¶ 51. Mr. Gray is also scheduled to have cataracts surgery this month and he has very recently been diagnosed with a heart condition. But, on the other hand, Mr. Gray has seemingly finally got his gambling problem under control. Mr. Gray is extremely happy with the Gambler's Anonymous program and realizes that the program has helped him tremendously. Additionally, despite Mr. Gray's termination from his employment as a result of the instant offense, Mr. Gray has managed to secure employment as a full time delivery person for Papa John's Pizza. PSR, ¶ 60. Mr. Gray has been employed with Papa John's in Silver Spring, Maryland for about nine months. Finally, Mr. Gray has been doing well while on pretrial release. Mr. Gray's urine sample indicates

---

[6] Since Mr. Gray began gambling, he has suffered a few arrests for fairly minor offenses. Importantly, none of these arrests resulted in a conviction and the instant offense marks Mr. Gray's first conviction for a criminal offense.

[7] Mr. Gray worked as an Accounts Receivable Clerk from 1994 to 1995 and he worked for Accountants on Call from 1995 to 2006. PSR, ¶¶ 62 & 61.

that he is drug free and Mr. Gray is in compliance with his release conditions.  PSR, ¶ 10.

    2.    <u>Factors Pursuant to 18 U.S.C. § 3553(a)(2)</u>

As with most offenses, theft from an employer is serious misconduct.  Such misconduct, however, is not nearly as egregious as conduct involving violence, dangerous threats, weapons or serious drug related activity.  Moreover, in this particular case, the seriousness of Mr. Gray's nonviolent offense is significantly mitigated by the fact that Mr. Gray's addiction to gambling primarily contributed to his commission of the offense.  Mr. Gray's cooperativeness with the investigation surrounding his misconduct and his consistent acceptance of responsibility further lessen the seriousness of his offense.  Mr. Gray's efforts with regard to curing his gambling problem provides even further mitigating evidence in this matter.  Due to these factors regarding the seriousness of this offense as well as Mr. Gray's history and characteristics (e.g. his lack of any prior criminal convictions, his educational history, and his employment history), a sentence involving no further incarceration is a sentence which will adequately promote respect for the law and such a sentence will provide just punishment for the offense.[8]

Due to the unique circumstances which drove Mr. Gray to commit the instant offense, a sentence involving no further incarceration will provide ample deterrence for Mr. Gray and anyone else who may consider committing a similar crime.  <u>See</u> 18 U.S.C. § 3553(a)(2)(B).  For Mr. Gray or any other similarly situated person, the hassles and consequences of being prosecuted and obtaining a felony conviction is a huge deterrence.  Also, the obligations, restrictions and limitations on ones freedom due to being placed on supervision is substantially punitive and will have a

---

[8] <u>See</u> 18 U.S.C. § 3553(a)(2)(A).

profound deterrent effect.[9]

Considering that Mr. Gray is aggressively and successfully tackling the problem which caused him to commit the instant offense, no additional period of incarceration is necessary in order to protect the public from any further crimes by Mr. Gray. See 18 U.S.C. § 3553(a)(2)(C). Mr. Gray has no prior convictions and he had never even been arrested before he started gambling in 1991. When Mr. Gray was not gambling, he was a law abiding and hard working model citizen. Now that Mr. Gray has his gambling problem behind him, the community needs no protection from him. Under these circumstances, there is absolutely no need to incarcerate Mr. Gray for any purpose related to protecting the community.

Further incarcerating Mr. Gray will not assist him with any educational, vocational, medical or other correctional training, treatment or care. See 18 U.S.C. § 3553(a)(2)(D). Mr. Gray has already obtained two Bachelors degrees and he has a lengthy and well respected employment history. In fact, incarceration will only cause a substantial disruption and setback with respect to Mr. Gray's employment and educational situation.

3.  The Kinds of Sentences Available (18 U.S.C. § 3553(a)(3))

Because there is no statutory mandatory minium sentence required in this case and because

---

[9]In Gall v. United States, the Supreme Court emphasized that non-custodial sentences which involve only supervision are "nonetheless subject to several standard conditions that substantially restrict [a defendant's] liberty." 128 S.Ct. at 595. The Gall Court further notes that '[p]robation is not granted out of a spirit of leniency' and that 'probation is not merely "letting an offender off easily"' (quoting Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957)). Id.. The Court continues by noting the following: '[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society .... Often these conditions comprehensively regulate significant facets of their day-to-day lives .... They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a case worker or psychotherapist' (quoting 1 N. Cohen, The Law of Probation and Parole § 7:9 (2d ed. 1999). Id..

a sentence within the Sentencing Guidelines is clearly not mandatory, a sentence of probation is a sentencing option which is available to this Court. The court can include as a condition of probation that Mr. Gray spend several months of his supervision under home confinement. A home confinement requirement to a probationary sentence allows the court to significantly restrict Mr. Gray's freedom without having to impose any incarceration. In order to further punish Mr. Gray and to provide some assistance to the community, the Court may also order Mr. Gray to perform a substantial amount of community service while on supervision.

4. <u>The Need to Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6))</u>

As the plea agreement in this case contemplates, Mr. Gray may be subject to "detention, deportation and other sanctions at the direction of the U.S. Immigration and Customs Enforcement." Plea Agreement at 4. Defendants who are serving sentences and are subject to deportation may be required to serve the entire sentence imposed (minus credit for time served and statutory good time credit) before being deported. Defendants who will not be released in the United States are ineligible for Bureau of Prison pre-release programs. Additionally, such defendants will be precluded from eligibility in certain programs while serving their sentences. Thus, simply due to Mr. Gray's immigration status, he will likely not receive many benefits which are routinely afforded other inmates. Consequently, Mr. Gray will be more severely punished than other similarly situated defendants due simply to his immigration status. Mr. Gray will likely be more severely punished in both the duration of his sentence and in the quality of life he will endure while serving his sentence in a Bureau of Prisons facility. Following Mr. Gray's prison sentence, he could spend additional time in custody as his matter is being handled by the immigration authorities.

For the foregoing reasons, a sentence below the advisory guidelines range is appropriate in

order to avoid unwarranted sentencing disparities. If Mr. Gray were to be sentenced within the applicable guideline range, when comparing him to most other defendants who fall in the same guideline range, Mr. Gray would likely serve additional time in custody and be denied certain benefits merely due to his immigration status. Because such result is unfair and unwarranted, a sentence below the guideline range is appropriate and reasonable.

    **C.**    **Conclusion**.

For the reasons discussed above, a sentence of probation is the most reasonable and appropriate sentence in this case. Such a sentence will adequately punish Mr. Gray as well as afford him an opportunity to remain in the community and live the hard working and respectable life he typically lives. A probationary sentence is also appropriate and desirable because it will allow Mr. Gray to continue receiving the much needed assistance he has been receiving from Gambler's Anonymous in Silver Spring, Maryland. Mr. Gray has benefitted tremendously from this program and discontinuing his treatment will provide a disservice to both Mr. Gray and the community. The community will be further benefitted by a probationary sentence if it includes a community service component. For these reasons, as well as any other reasons this Court may consider, Mr. Gray respectfully requests that the court impose a sentence of probation in this matter.

    Respectfully submitted,

    A. J. KRAMER
    FEDERAL PUBLIC DEFENDER


    _____/s/_____
    TONY W. MILES
    Assistant Federal Public Defenders
    625 Indiana Avenue, N.W.
    Washington, D.C.  20004
    (202) 208-7500